## COOKSEY *v.* BRYAN.

RESULTING TRUST; EVIDENCE; LACHES; PRESUMPTIONS; ESTOPPEL.

1. Equity will regard with great suspicion an attempt to show a resulting trust in a transaction 30 years after its consummation, especially when the trustee and other immediate parties thereto are dead; but when the proof is clear and positive a trust will be declared under such circumstances; and in such a case parol testimony is admissible against an answer denying the trust.

2. Upon the death of a father, intestate, in 1859, his real estate was sold at auction in six parcels by his heirs at law, three sons and three married daughters. The property was bought by the heirs, some taking more and some less than their distributive shares of the estate, the amount of such shares being credited on their purchases. The husband of one of the daughters bid in two parcels and was credited with the amount of his wife's share, which with her interest in the personalty slightly exceeded the price paid by him for the first parcel bought by him. The balance of the purchase price of the two parcels he paid in cash, whether with his own or his wife's money was controverted. A deed of bargain and sale was made to the husband in which all of the heirs joined, except his wife. In a suit by the executor of the wife, on behalf of her heirs, against the heirs of her husband to establish a resulting trust in the complainant, it was *held:*

(a) That the defense of laches under the circumstances of the case was not available against the heirs of the wife;

(b) That an intent on the part of the wife to convert her interest in the realty into money, which would in that event have belonged absolutely to the husband, could not be presumed;

(c) That the husband had taken a resulting trust for his wife in that parcel of real estate whose value slightly exceeded her distributive share of the estate, which trust would be declared to be in her executor upon the surrender by him of the legal title to the undivided one-sixth interest which had remained in the wife through her failure to join in the deed to her husband; and

(d) That the other parcel had not been charged with a resulting trust, whether the husband had purchased it with her money or his own.

3. The statement by a wife in her petition for letters testamentary on her husband's estate, that a portion of the estate devised to her consisted of certain real estate, will not in the absence of proof that such statement misled or injured some one interested, estop her executor from afterwards, when the will of her husband has been discovered to be invalid as to such real-estate, claiming against the heirs of the husband that the real estate had been charged with a resulting trust in favor of his decedent.

No. 187. Submitted January 11, 1894.—Decided March 6, 1894.

HEARING on an appeal by the complainant from a decree of the Supreme Court of the District of Columbia, holding an equity term, dismissing a bill to establish a resulting trust. *Reversed.*

The COURT in its opinion stated the case as follows:

This is a suit in equity instituted for the purpose of having a deed absolute on its face decreed to be a resulting trust.

On or about April 4, 1858, one Peter Hepburn died in the city of Washington intestate, and leaving considerable estate, both real and personal in said city. The heirs at law, who were all of age, three sons and three daughters, the latter all married, caused the real estate to be put up for sale at public auction, either for the purpose of fixing a price upon it and bidding it in by way of amicable partition between themselves, or in order to convert it into money and to divide the proceeds between themselves. What their special purpose was, is one of the contested points of the case. The real estate so put up for sale comprised four separate pieces of land, with frame houses upon them or upon parts of them, the total value of which, in the aggregate, as determined by the result of the auction, was the sum of $5,533.95. One-sixth part, which was the share of each heir, was therefore of the value of $922.325. The property, however, was capable of further subdivision, and was actually disposed of in six parcels, of which the first (the east part of lot 5, in square 296) was sold and conveyed to George S. Hepburn, one of the sons of the deceased, for $1,100; the second was sold and conveyed to W. T. Donophant· or Doniphan, the husband of one of the daughters (the west part of lot 5, in square 296), for $1,100; the third, a vacant piece of ground adjoining that last-mentioned, was sold to the same Doniphan for $242.25; the fourth (lot 15, in square 388) was sold to Peter Hepburn, another of the sons, for $710; the fifth ( one-half of lot 9, square 296, with improvements), was first purchased by Doniphan for $1,800,

but afterwards surrendered by him, as will be stated; and the fourth (one-half of lot 9, square 296, unimproved), was sold to Peter Hepburn, for $581.70, but was likewise surrendered by him.

The withdrawal of Doniphan and Peter Hepburn, from these last two purchases, was due to the dissatisfaction of three of the heirs, one son and two daughters, who resided in Baltimore, and who did not regard the prices bid for these two parcels as sufficient. Accordingly, these two parcels were conveyed, to the son and the husbands of the two daughters who resided in Baltimore, with an agreement between them and the other heirs providing for an equalization of their shares. This property seems to have been afterwards satisfactorily disposed of, and its disposition is of no direct consequence in this suit.

Deeds were executed between the heirs, together with their respective husbands and wives, being in form the ordinary deeds of bargain and sale, and not purporting to be deeds of partition. The daughters of the deceased Hepburn joined in the execution of all the deeds except those to their respective husbands. So, in the deed to Doniphan for the property purchased by him or allotted to him in right of his wife, whichever the case may have been, his wife did not join. All this happened in 1859.

The whole transaction was managed by Mr. Asbury Lloyd, then a member of the bar of the District of Columbia, under agreement between all the heirs. Mr. Lloyd, who testified as a witness in this suit, recognized the account stated by him at the time between the parties; and in this account it appeared that the several purchasers were charged with the amount of their respective purchases and received credit for the amount of their distributive shares ($922.325) as above, and either paid to the trustee, Lloyd, or received from him the balance between the two sums, the surplus of cash in his hands being for the benefit of those of the heirs whose purchases fell below their distributive shares. Doniphan's two purchases ($1,100 and $242.25)

aggregated the sum of $1,342.25, for the payment of which he was credited with his wife's distributive share ($922.325), and the residue ($419.925) he paid in cash, whether in his own money or with money received from his wife, is controverted. For it appears that Mrs. Doniphan was in the receipt of money from her own earnings, and apparently also by gifts from her father during his lifetime. And the deceased Hepburn also left some personal property, of which there was the sum of $1,130.60 available and divisible at the time of his death; and the further sum of $3,003.45 was derived in 1872 from the result of a protracted lawsuit.

The property thus purchased by William T. Doniphan, it has been stated, was in part improved and in part unimproved. The property was the west 31 feet and 2 inches of lot 5, in square 296; and the eastern part of it had on it a frame dwelling, and the western part, which comprised 950 square feet, was then vacant. Upon this western portion a house was subsequently constructed.

From the foregoing it appears that William T. Doniphan received the legal title to the five-sixths undivided part of the property just mentioned; and that the title to the remaining one-sixth part remained in his wife, Mary Ann Doniphan. And this condition of things lasted during their joint lives. William T. Doniphan died on December 11, 1882, without issue, leaving his wife, Mary Ann Doniphan, surviving him, and leaving also a will, executed on August 4, 1855, whereby he gave all his estate to his wife, therein acknowledging that to her industry and economy he was indebted mainly for all that he had. This will being executed four years before the acquisition by him of the property that has been mentioned, was inoperative in regard to it; and as to that property it is conceded that he died intestate. The widow, Mary Ann Doniphan, caused the will to be probated in January, 1883; and in her petition filed in the Orphans' Court, wherein she asked for probate, she stated under oath, that in the estate devised to her by the will was included that which has been mentioned. For it ap-

pears that she was unaware, and probably so remained until her death, that the will was inoperative to transfer this property. She entered into possession of it, however, and held that possession undisturbed until her death, November 23, 1888. By her will, dated November 9, 1888, she had devised her estate in trust to her executor, J. Walter Cooksey.

Then it was that the discovery was made that the will of William T. Doniphan was inoperative as to the property purchased by him from the Hepburn estate; and that consequently that property could not pass by the will of Mary Ann Doniphan, unless it could be shown that William T. Doniphan took it under a resulting trust for his wife. The present suit was instituted by the executor of Mary Ann Doniphan, in order to establish such a trust; and from the pleadings and testimony in the case the facts have been developed which are here recited. The bill was filed against the heirs at law of William T. Doniphan, the children or descendants of a brother and two sisters, some of them being minors—all of whom, so far as they can, deny the existence of the trust, and require strict proof of its existence.

The testimony taken in the cause was mainly on the part of the complainants, and consisted principally of the depositions of three of the surviving heirs of the deceased Hepburn, and of two of the husbands of the daughters, besides that of Mr. Asbury Lloyd, the attorney who acted for the parties, as heretofore stated. The purpose of this testimony was in substance, to show that William T. Doniphan was a man without means; and that it was his wife's money that went to the purchase of the property in suit; and that the transaction between the Hepburn heirs in 1859 was nothing more than a partition of the estate between themselves. The effort of the defense, on the other hand, was to show that the transaction on Doniphan's part was an actual purchase by him; that he was not without means; and that he had frequently expressed his intention of providing for his own relatives—an intention which was supposed to have been frustrated upon the publication of his will.

The court below dismissed the bill; and from its decree of dismissal the complainant prosecutes the present appeal.

*Mr. J. Walter Cooksey* for the appellant.

*Mr. J. J. Darlington* and *Mr. W. H. Sholes* for the appellees.

1. If the disposition of the real estate of the common ancestor was a *partition* among the heirs, in the legal sense of that term, a conveyance of *Mrs. Doniphan's share* thereof to the husband would have constituted him a trustee for her. This is in accordance with the weight of authority. If the heirs of Peter Hepburn simply agreed upon an allotment in severalty to each, of his or her undivided interest in the realty of their ancestor, conveyance by the other heirs of Mary Ann Doniphan's share to her husband, unexplained, would have made him trustee for her.

2. If the disposition of the real estate was a sale, for the purpose of distributing the proceeds among the heirs, there was *conversion*, entitling the husband to credit for the wife's share, upon his purchase, and for his own benefit. This foregoing proposition was not, and cannot be, disputed. If the disposition of Peter Hepburn's realty was, in legal effect, a sale, and an allotment or distribution of the proceeds among his heirs, at which sale William T. Doniphan became the purchaser of the described parts of lot 5, in square 296, he acquired both the legal and beneficial title thereto, transmissible to his heirs at law. *Ermold* v. *Newkirk,* 16 Pa. St., 417, 426; *Silear* v. *McClanachan,* 2 Gratt., 280. In the case at bar, it was, of course, unnecessary that the husband should receive the wife's share in money, in order to effect conversion. The application by him of that share toward payment of the purchase money of the parcels of land purchased by him was, itself, a reduction into possession. Under the authorities, however, no reduction was necessary; the mere *agreement* to sell effected conversion.

3. The proposition contended for by the appellant that the cash payment by the husband should, as a matter of

law, be treated as a gift to, or settlement upon, the wife, by him, leaving him without any beneficial interest in any part of the property, except his life estate as husband, is clearly untenable. The only authority cited in its support was *Campbell* v. *Wallace*, 12 N. H., 362, in which case, however, the conveyance was to the wife, and not to the husband, in which case, unquestionably, the payment by the husband of owelty due from the wife, unexplained, must naturally be construed as a gift or settlement upon her. As will be perceived, there is not the remotest analogy to the case at bar.

In addition, it will be observed that the proposition, even if correct, that owelty upon partition paid by the husband is to be considered as a gift to the wife, would not be applicable to the facts of this case. Owelty is "the difference which is paid by one coparcener to another for the purpose of equalizing a partition"; and applies only where by reason of the impracticability of an equal division in kind a more valuable part is necessarily allotted to one than another of the heirs. But, in the present case, Mr. Doniphan, after buying a house and lot which exceeded his wife's share, bought a vacant lot in addition, subsequently improved by the erection of a dwelling, the price of which vacant lot was wholly covered by the cash paid by him, and still left a considerable portion of such cash payment to be applied upon the house and lot. These facts are utterly inconsistent with any understanding on the part of either Mr. Doniphan or the heirs, or any of them, that he was taking title as trustee for his wife of her share of her father's real estate.

Were the facts otherwise, and were the cash payments owelty, paid as such, still, both in principle and under the authorities, the husband would be purchaser, in his own right, of such proportion of the land as the cash payment paid for. *Fogelsonger* v. *Somerville*, 6 Serg. & R., 267, 270-1. In any event, therefore, we submit that Mr. Doniphan must be held to be purchaser of the vacant lot, and purchaser *pro tanto* of the lot improved at the time of his purchase.

Mr. Justice MORRIS delivered the opinion of the Court:

A court of equity must regard with great suspicion any attempt to show a resulting trust in a transaction thirty years and upwards after the transaction has been consummated, and especially when the immediate parties to the transaction are both dead. Indeed, at one time, it was greatly questioned whether such an attempt ought to be allowed at all after the death of the person primarily interested and who is sought to be held as a trustee (Sanders on Uses and Trusts, 127-134); and even Sir Edward Sugden, in his work on Vendors and Purchasers, 414-19, doubted whether parol proof was admissible to prove such a trust against the answer of the alleged trustee denying the trust. But it seems now to be well established, both that parol testimony is admissible against an answer denying the trust, and that the trust may be proved after the death of the trustee. Story's Equity Jurisprudence, Sec. 1201, and cases cited in notes; *Boyd* v. *McLean*, 1 John. Ch., 582, per Chancellor Kent; *Prevost* v. *Gratz*, 6 Wheaton, 481. Yet the rule remains that the most clear and positive proof is required under such circumstances to establish a trust. We are satisfied that such proof is not wanting in this case.

Whether, in putting up the estate at auction in 1859 it was the intention of the parties to procure a valuation merely and thereby a basis of partition between themselves, or to convert the estate into personalty and a division of the proceeds of sale, is not clear. It is quite probable that the parties themselves had no very well defined views or purposes in the matter beyond the desire to make a division of the estate in some way. The sale was undoubtedly, so far as the testimony shows, a *bona fide* one, at which strangers to the estate might bid and get the property; and yet it is quite evident that the heirs reserved and actually exercised the right to bid in for themselves something approaching their respective shares in value. If there were any other bidders than the heirs, their bids were not deemed satisfactory; and the result was that the heirs took all the prop-

erty between themselves, some taking more, others less than their distributive shares, and paying to the others or receiving from them the difference in money. It is testified that there was a notion prevalent at the time that it was unsafe to take the title to real estate in the name of a married woman; and accordingly the property which was supposed to represent the shares of the two daughters who resided in Baltimore was conveyed to their respective husbands; and it is claimed that the conveyance to Doniphan was upon a similar consideration and for the same reason.

It is apparent, however, that Doniphan was not merely acting for his wife in the transaction, or to secure the equivalent of her distributive share. Beyond question, he was to some extent a purchaser; for he bid in three or four pieces of the property at a price amounting to upwards of three times the value of his wife's distributive share of the estate. And although he afterwards surrendered his largest and most valuable purchase to the Baltimore heirs, the evidence of his intent is no less manifest to purchase for himself as much as he could of the estate. It is of no consequence where he procured the money with which he intended to consummate these purchases, whether it was the result of his own earnings or of those of his wife, or whether it was money in any manner derived to her from her father. The law, as it existed at the time, made it all the money of the husband, no matter from what source it came.

But it is also apparent that Doniphan's primary intention was to secure his wife's share of the property, and that without payment for it otherwise than by a credit to him of a sum of money equal to the value of such share. This sum was actually credited to him in the purchase, as it was to each of the other parties, and it did not fall much below his first purchase ($1,100). Indeed, if we allow for the distributive share of the personalty that was payable at the time to Mrs. Doniphan ($188.43), we find that her aggregate interest at the time in her father's estate ($922.325 and $188.43) amounted to $1,110.75, or only $10.75 beyond the amount

of Doniphan's first purchase. While it is true that he was entitled, as we have already stated, under the condition of the law as it then existed, to receive his wife's share of the personalty, it is no violent inference from the testimony to assume that he permitted this sum to go to make up the payment for his first purchase and thereby to inure to the benefit of the owner of the property; and that he never actually received the money. At all events, the substantial part of the payment for this purchase was not actually money, but merely credit of the amount of the value of his wife's share of her father's real estate. The payment was by the wife, and not by the husband; and if this case were between other parties than husband and wife, or their representatives, there would be no room whatever for doubt that the nominal purchaser took the property under a resulting trust for the person from whom the consideration moved. Why should a different rule prevail in equity as between husband and wife, unless there is some rigid requirement of the law to demand it? Such a requirement is presumed to be found in the assumption that there was a conversion by the wife in this instance of her interest in the realty and its change into money; that this money thereupon became the absolute property of the husband; and that when he used this money in the purchase of the realty, he was using his own and not his wife's money; and that therefore there could be no resulting trust for her benefit. The artificial character of this argument is quite apparent; and the conclusions to be adduced from it are undoubtedly antagonistic to the true purposes and intentions of the parties. Confessedly there was no actual conversion of the realty into money by Mrs. Doniphan. The conversion, if it is to be construed to have occurred at all, was purely technical—the legal result of the transaction, and not the actual, declared or expressed intention of the parties. Should a married woman be deprived of the beneficial ownership of property, to which otherwise she is undoubtedly entitled, by the interposition of a technicality

that is based upon intention, when at the same time the law places her under a disability that prevents any such intention from being carried into effect, by disabling her from entering into contracts except in a very restricted manner? We cannot think so. We cannot infer an intention in this case on the part of Mrs. Doniphan to convert her real estate into money. Such intention, if it existed, should be clearly proved. We find no proof of it in the record; and we cannot regard as proof a mere inference from the form of the transaction plainly antagonistic to the substance of it.

We think this conclusion is sustained not only by reason, but by numerous authorities. See 2 Story's Eq. Jur., Sec. 1214; *Wales* v. *Newbould,* 9 Mich., 45; *Weeks* v. *Haas,* 3 Watts & Sergeant, 520; *Jones* v. *Jones,* 1 Bland, 443, 455; *Lynn* v. *Gephart,* 27 Md., 547.

In the case last cited, *Lynn* v. *Gephart,* the Court of Appeals of Maryland said: " The inclination of courts of equity upon this branch of jurisprudence is not generally to change the quality of the property unless there is some clear intention or act by which a definite character, either as money or as land, has been unequivocally fixed upon it throughout." And in the case of *Jones* v. *Jones,* 1 Bland, 455, Chancellor Bland very forcibly remarked: " A married woman who is entitled to an undivided part of a real estate, cannot be in any way deprived of it without her express consent; which by the common law, can only be obtained by a fine, or, under the acts of Assembly, by her privy examination and acknowledgment of a deed conveying it to another. From necessity, and for the purpose of effecting a partition of a real estate, which is incapable of division without loss, it may be sold and converted into personalty. But a change in the nature of property, in order to attain a particular object, should not divest the owner of his right to it, to any extent whatever."

We do not understand that the case or *Ermold* v. *Newkirk,* 16 Penn. St., 417, is antagonistic to the position here assumed. There, there had been an actual sale and conver-

sion of one piece of property, and the purchase of another with the proceeds; and the purchase was held to be by the husband on his own account, and not in trust for his wife, to whom belonged the property that had been sold.

The case of *Weeks* v. *Haas*, 3 Watts & Serg., 524, also in the State of Pennsylvania, seems to be more directly in point. That case was very like the present; and the Supreme Court of Pennsylvania, by Chief Justice Gibson, who delivered the opinion, held that the object of the parties being partition, the form of the deed was of no consequence, and the husband took a resulting trust for his wife. And in the case of *Fogelsonger* v. *Somerville*, 6 Serg. & Rawle, 267, cited with approval in *Weeks* v. *Haas*, the same principle was held. For, although the husband was allowed to hold in his own right as much as he had actually paid for, he was held as a trustee for as much of the property as was the equivalent of the wife's distributive share.

We think, therefore, that it is only just and equitable that the first so-called purchase made by Doniphan for $1,100 should be regarded as having been made in trust for his wife and as the equivalent of her share of her father's estate, and that her one-sixth interest in her father's estate was merged in this purchase.

The case is very different, however, with regard to his subsequent purchase. There it is plain that he was acting for himself and not for his wife; and it is of no consequence from what source the money was derived to make the purchase. For this property there was money actually paid by him; and the purchase was entirely independent of any effort or purpose to secure his wife's distributive share of the estate. We regard as wholly unsustained by the proof the attempt to show that he was financially unable to make this purchase; and, as we have stated, it is of no consequence whether he was or not. We find no evidence whatever of a resulting trust in this instance; and we are of opinion that Doniphan took this purchase free and clear of any claim of his wife, legal or equitable, other than her dower interest.

Under the peculiar circumstances of this case, we cannot regard the defense of laches as available against the heirs of the wife. While, as we have already stated, we must regard with great suspicion an attempt to declare a resulting trust in a transaction that for thirty years and upwards has presented no indication of any such trust, yet it is not to be forgotten that the statute of limitations would not have barred an action of ejectment in this case, if the heirs of the wife had been put to such action; that her disability of coverture precluded the running of the statute during the time of the joint lives of herself and her husband; that the period of ten years allowed for the institution of such a suit by the statute of limitations after the removal of the disability had not elapsed when this bill was filed; and that the very natural mistake of Mrs. Doniphan in supposing herself the owner of the property under the will of her husband, although to some extent only a mistake of law, might very well be regarded as a sufficient excuse for her failure to institute any legal proceedings for the assertion of her rights during her lifetime.

Neither can we regard the statement of Mrs. Doniphan in her petition for letters testamentary on the will of her husband, to the effect that the estate devised and bequeathed to her by him consisted, with other property, of two small frame houses, which are agreed to be upon the property in controversy in this suit, as either an estoppel upon her against the assertion of her rights as formulated in the bill of complaint in this case, or as admission of the character of the transaction in 1859 as being a conversion of her father's realty into personalty and an application of the latter by the husband to his own uses. If this was a mistake it injured no one, and no one was misled by it to his detriment. Consequently, there is no good reason to regard it in the light of an estoppel. Nor does it tend much, if at all, to show what view Mrs. Doniphan took of the transaction of 1859. As a matter of fact, there was in William T. Doniphan a legal title to the property; and he did have

something that might well be the subject of devise; and the devise, if the will had been effectual instead of being inconsistent with the theory of a resulting trust, would have effectively accomplished the purposes of such a trust.

It is conceded that, as the record now stands, inasmuch as Mrs. Doniphan never executed any conveyance of her interest in the property to which her husband took title, she retained the legal title to one-sixth undivided interest therein; and to that extent her right and title have become vested in her devisee, the complainant in this case. But in the allowance of her whole share of the estate, as a credit upon the purchase made by her husband, it is quite evident that it was the intention of all the parties that such one-sixth interest should be regarded as merged in the purchase. At all events, it does not seem to us to be equitable that a resulting trust should be declared in her husband's purchases in her favor to the extent of her whole and entire interest in her father's estate, and yet that she should also have in addition thereto a one-sixth undivided legal interest, which, through accident or inattention, or because it was not deemed important at the time, she failed to relinquish. The resulting trust, therefore, which we find in her favor must be deemed to be subject to the relinquishment on her part of the one-sixth so retained. *He who seeks equity must do equity.*

Upon the condition that the complainant in this case will execute a proper quit-claim deed to the parties in interest of the said one-sixth undivided part, so far as the same affects the second lot of land purchased by William T. Doniphan, he will be entitled to have a resulting trust declared in his favor as the representative of Mary Ann Doniphan in the first lot of land purchased by said William T. Doniphan, and not otherwise.

*The decree of the court below will be reversed, and the cause will be remanded to that court, with directions that, if the complainant in this cause, within such time as the court may prescribe, will execute and deliver a proper deed of con-*

*veyance of the aforesaid one-sixth interest, as aforesaid, then he shall be decreed as the representative of the aforesaid Mary Ann Doniphan, to be the owner, by virtue of a resulting trust, of all the right, title, interest and estate that was vested in the aforesaid William T. Doniphan in and to the first lot aforesaid purchased by him; otherwise, the bill of complaint shall be dismissed. And as to the second lot purchased as aforesaid by William T. Doniphan, it shall be decreed that said purchase was in his own right, and not subject to any resulting trust; and as to that lot the bill of complaint shall stand dismissed. Each party will pay his own costs in this court.*

Upon motions to amend the decree heretofore rendered in this case, the court, by Mr. Justice MORRIS, on April 2, 1894, said:

Motions have been made both by the appellant and the appellees for amendment of the decree in this cause, and both motions seem to be well grounded. The appellant's motion has reference to the use of an alley or private passage-way between the two pieces of property disposed of by the decree; and the motion of the appellees suggests that the appellant should account to the appellees for all the rents received by him from the west part of lot 5, in square 296, from the 23d day of November, 1888, as a preliminary to his having a resulting trust declared upon the other property.

The motion of the appellees is granted. He that seeks equity must do equity; and it would not be equitable to permit the appellant to divest the appellees of their legal title to part of the property without accountability by him to them of the rents which he has received from the other part, against which he should not be allowed to protect himself by the interposition of the statute of limitations.

So far as concerns the alley, it is not quite apparent that we have enough in the record to enable us to decide the rights of the parties intelligently. And therefore it seems

to be proper that, in remanding the cause to the Supreme Court of the District of Columbia, it should be without prejudice to the rights of either of the parties in this regard. They will be at liberty to bring their respective claims before that court for adjudication and settlement.

*The decree will accordingly be amended in accordance with this opinion.*